

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Southern Division*

*Kelly O. Hayes*
*Assistant United States Attorney*
*Kelly.Hayes@usdoj.gov*

*Mailing Address:*
*6500 Cherrywood Lane, Suite 200*
*Greenbelt, MD 20770-1249*

*Office Location:*
*6406 Ivy Lane, 8th Floor*
*Greenbelt, MD 20770-1249*

*DIRECT: 301-344-0041*
*MAIN: 301-344-4433*
*FAX: 301-344-4516*

November 22, 2023

<u>Via ECF</u>

The Honorable Deborah K. Chasanow
United States District Judge
District of Maryland
6500 Cherrywood Lane
Greenbelt, Maryland 20770

     Re:    <u>United States v. Njuh Valentine Fombe</u>,
             Criminal No. DKC-19-452

Dear Judge Chasanow:

     In light of the Defendant's decision to plead guilty to Count One and Count Two of the Indictment pending against him in the above-referenced case without the benefit of a plea agreement, this letter sets forth the relevant minimum and maximum statutory penalties of incarceration, fines, and terms of supervised release. It also addresses several matters the Government submits will be relevant to the Court's Rule 11(b) colloquy. A re-arraignment is currently scheduled for **Monday, November 27, 2023** at 2:15 p.m.

Offenses of Conviction

     1.    The Government understands that the Defendant intends to plead guilty to Count One and Count Two of the Indictment now pending against him, which charges the Defendant, in Count One, with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349; and in Count Two, with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h). The Government understands the Defendant will admit that he is, in fact, guilty of the offenses and will so advise the Court.

Elements of the Offenses

     2.    The elements of the offenses to which the Defendant will plead guilty, and which the Government would prove if the case went to trial, are as follows: That on or about the time alleged in the Indictment, in the District of Maryland and elsewhere:

Count One (Conspiracy to Commit Wire Fraud): (1) Two or more persons entered the unlawful agreement charged in the Indictment, that is conspiracy to commit wire fraud; and (2) the Defendant knowingly and willfully became a member of that conspiracy.

Count Two (Conspiracy to Commit Money Laundering): (1) the Defendant and at least one other person agreed to commit one or more of the substantive money laundering offenses proscribed under 18 U.S.C. § 1956(a), as charged in the Indictment; (2) the Defendant knew that the money laundering proceeds had been derived from an illegal activity; and (3) the Defendant knowingly and voluntarily became part of the conspiracy.

Penalties

3. The maximum penalties provided by statute for the offenses to which the Defendant will plead guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1349 | N/A | 20 years | 3 years | $250,000 or twice the gross gain or loss, whichever is greater | $100 |
| 2 | 18 U.S.C. § 1956(h) | N/A | 20 years | 3 years | $500,000 or twice the value of the property involved, whichever is greater | $100 |

      a.    Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

      b.    Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

      c.    Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

      d.    Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

   e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

   f. Collection of Debts: If the Court imposes a fine or restitution, the Government's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes the Government to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by the Government.

<u>Waiver of Rights</u>

 4. The Government submits that, by pleading guilty to Count One and Count Two, the Defendant surrenders certain rights as outlined below:

   a. If the Defendant had pleaded not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial on Count One and Count Two with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, the Government, and the Court all agreed.

   b. If the Defendant elected a jury trial on Count One and Count Two, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

   c. If the Defendant went to trial on Count One and Count Two, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

   d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If

the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

    e.  If the Defendant were found guilty on Count One and Count Two after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f.  By pleading guilty, the Defendant should understand that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case.

    g.  If the Court accepts the Defendant's plea of guilty on Count One and Count Two, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case with respect to Count One and Count Two, and the Court will find the Defendant guilty of those counts.

    h.  By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. If the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant should understand that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status.

<u>Factual and Advisory Guidelines</u>

  5.  The Government submits that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(c)) and 28 U.S.C. §§ 991 through 998. The Defendant should understand that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

  6.  Below are the Government's preliminary guideline calculations. Given that there is no plea agreement in this case, there also is no agreement as to the applicable offense levels or criminal history category. The offense levels set forth below are intended only to assist the Court at the Rule 11 proceeding on Count One and Count Two, and do not bind the Government in any way. The Government may argue in favor of a different offense level at sentencing.[1]

---

[1] As the Court is aware, this Office asserts that the Defendant committed unemployment insurance fraud while a fugitive residing in the United Kingdom and elsewhere. These

Count One (Conspiracy to Commit Wire Fraud):

    a.    The applicable base offense level is **7**, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1(a)(1).

    b.    A **16**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(1)(H) or (I), because the loss reasonably foreseeable to the Defendant and within the scope of the conspiracy was more than $1,500,000 but not more than $3,500,000.

    c.    A **2**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(2)(A), because the offense involved 10 or more victims and/or resulted in substantial financial hardship to one or more victims.

    d.    A **2**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.

    e.    A **2**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(ii), because the offense involved the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification.[2]

    f.    A **2**-level increase applies, pursuant to U.S.S.G. § 3B1.1(c), because the Defendant was an organizer, leader, manager, or supervisor in any criminal activity.

Count Two (Conspiracy to Commit Money Laundering):

    g.    The applicable base offense level is the offense level for the underlying offense from which the laundered funds were derived, namely wire fraud, pursuant to U.S.S.G. §§ 2S1.1(a)(1) and 2B1.1.

    h.    A **2**-level increase applies, pursuant to U.S.S.G. § 2S1.1(b)(2)(B), because the Defendant will be convicted under 18 U.S.C. § 1956.

    i.    A **2**-level increase applies, pursuant to U.S.S.G. § 2S1.1(b)(3), because the offense involved sophisticated laundering.

Obstruction of Justice

    j.    A **2**-level increase applies, pursuant to U.S.S.G. § 3C1.1, because the Defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration

---

guidelines calculations do not include the loss amounts this Office intends to prove at sentencing as a result of such unemployment insurance fraud.

[2] If the Defendant is convicted after trial on Count Three (Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A), this enhancement would not apply.

of justice with respect to the investigation, prosecution or sentencing of the instant offense of conviction, and the obstructive conducted related to the Defendant's offense of conviction and any relevant conduct.

### Grouping

k.  Count One and Count Two group, pursuant to U.S.S.G. §§ 3D1.1 and 3D1.2(c) and (d).

### Acceptance of Responsibility

l.  There is no reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) and (b), Application Note 4, because conduct resulting in an enhancement under U.S.S.G. § 3C1.1 ordinarily indicates that the Defendant has not accepted responsibility for his criminal conduct.

### Forfeiture

7.  The Government will request that the Court, upon acceptance of the Defendant's guilty plea, enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offenses, substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

8.  Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Government will seek forfeiture to the United States all of the Defendant's right, title, and interest in the following items recovered from the Defendant that constitute money, property, and/or assets derived from, obtained by the Defendant as a result of, or involved in, the Defendant's illegal activities, including but not limited to **$5,250 in U.S. currency seized from the Defendant's residence on or about September 25, 2019.**

### Restitution

9.  The Government will request that the Court enter a restitution order for the full amount of the victims' losses, including any losses proven by a preponderance of evidence at sentencing. The Government will further request that the total amount of restitution shall be due immediately and shall be ordered to be paid forthwith.

### Factual Allegations

10. The Government asserts that the facts that establish the elements of Count One and Count Two have been met. If the Defendant had elected to proceed to trial on Count One and Count Two, the Government would have proven the following facts beyond a reasonable doubt, and may introduce these facts at a sentencing hearing:

At all relevant times, Defendant, **NJUH VALENTINE FOMBE, a/k/a "Fnu Njuh Valentine FOMBE," a/k/a "Unku Valentine," a/k/a "Valentine"** ("**FOMBE**"),

was a resident of Maryland, as were **Bernadette Mbi Fuo Attia** ("**Attia**") and **Gbenga Owolabi, a/k/a "Blow," a/k/a "Skb"** ("**Owolabi**").

Business Email Compromise ("BEC") schemes were complex schemes in which victims were deceived into sending money via wire transfers or other electronic funds transfers to bank accounts controlled by the criminal perpetrators. The victims erroneously believed the transfers were being sent to accounts of their legitimate counterparties when, in fact, they were being sent to bank accounts controlled by the criminal perpetrators.

Check schemes were schemes in which checks that were counterfeit or that were fraudulently obtained through unauthorized access to victims' bank accounts were deposited into bank accounts controlled by the criminal perpetrators.

WhatsApp was an encrypted Internet-based multimedia messaging service used via a smartphone application that functioned using both cellular and wireless data connections.

**The Drop Accounts**

"Drop Accounts" were bank accounts opened or controlled by **FOMBE**, **Attia, Owolabi**, and their co-conspirators that were used to receive money from victims of BEC schemes and Check schemes.

**The Victims**

The Minnesota Identity Theft Victim was a resident of Minnesota whose name, date of birth, and social security number the co-conspirators used to open Drop Accounts.

The Deceased Identity Theft Victim was deceased, but the co-conspirators used his name and social security number to open Drop Accounts.

Victims A through D and G, M, Q, O, and P were victims of BEC Schemes.

Victims H, I, J, L, and N were victims of Check Schemes.

**The Wire Fraud Conspiracy**

Beginning at least in or about September 2016, and continuing until at least in or about August 2018, in the District of Maryland and elsewhere, **FOMBE**, **Attia**, and **Owolabi** knowingly and willfully conspired with each other and other persons to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises ("the scheme to defraud"), and for the purpose of executing and attempting to execute the scheme to defraud, to transmit and cause to be transmitted by means of wire communication, in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343.

The intended loss arising from the conspiracy and scheme to defraud that was reasonably foreseeable to **FOMBE** was at least $2,174,019.  **FOMBE** further knew that the conspiracy and scheme to defraud involved 10 or more victims.

It was part of the conspiracy and scheme to defraud that **FOMBE**, **Attia, Owolabi**, and their co-conspirators gained unauthorized access to email accounts, personal identifying information, and bank accounts associated with individuals and businesses targeted by the co-conspirators (collectively, "the Victims").  **FOMBE**, **Attia, Owolabi**, and their co-conspirators then sent false wiring instructions to the Victims' email accounts from spoofed email accounts and produced and obtained counterfeit and fraudulent checks drawn upon (and purporting to be drawn upon) the Victims' bank accounts.  **FOMBE**, **Attia, Owolabi**, and their co-conspirators registered, and caused to be registered, in Maryland and elsewhere, businesses that were fraudulent, fictitious, and shell entities.  In addition, **FOMBE**, **Attia, Owolabi**, and their co-conspirators opened and managed, and caused to be opened and managed, Drop Accounts held in their own names, in aliases, and in the names of the fraudulent, fictitious, and shell businesses that they had registered, in order to direct into and receive the proceeds of BEC schemes and Check schemes.  **FOMBE**, **Attia**, **Owolabi**, and their co-conspirators communicated via WhatsApp and other means of electronic communication, including emails, to provide to each other information related to the BEC schemes and Check schemes, including Drop Account and wire transfer information.  **FOMBE**, **Attia, Owolabi**, and their co-conspirators then caused the Victims, and the financial institutions at which the Victims held bank accounts, to use the wires to transfer money to Drop Accounts.

In furtherance of the conspiracy, and to effect the objects thereof, **FOMBE**, **Attia, Owolabi**, and others known and unknown, committed and caused to be committed the following acts, among others, in the District of Maryland and elsewhere:

Swift Transfer LLC/Victim M (BEC) and Victim N (Check)

On or about December 2, 2016, Swift Transfer LLC was incorporated in South Carolina.

On or about December 20, 2016, **FOMBE** opened a SunTrust account ending in 0247 in the name of Swift Transfer LLC ("the SunTrust Swift Transfer Account").  **FOMBE** was the sole signatory on the account.  On March 14, 2017, the SunTrust Swift Transfer Account received a check deposit in the amount of $79,800 from Victim N.

On or about January 10, 2017, **FOMBE** opened a BB&T account ending in 0793 in the name of Swift Transfer LLC ("the BB&T Swift Transfer Account").  **FOMBE** was the sole signatory on the account.

On or about April 24, 2017, the BB&T Swift Transfer Account received an incoming $148,719.76 wire from Victim M, a business located in the United Kingdom. A second wire of $19,880.86 sent to the BB&T Swift Transfer Account on May 12, 2017, was successfully recovered for Victim M.  On April 25, 2017, the day after the $148,719.76

wire from Victim M, three official checks were generated that drew from funds in the BB&T Swift Transfer Account, as set forth below.

First, a $40,000 check made payable to Business 1 was deposited on or about April 25, 2017, into a SunTrust bank account ending x0114 held in the name of Business 1. The deposited check bore an endorsement of Business 1 and Individual 2 (the owner of Business 1). The funds were used to purchase a Porsche Panamera for **FOMBE**.

Individual 2 and **FOMBE** thereafter engaged in insurance fraud in North Carolina related to the Porsche Panamera. Specifically, on or about October 3, 2017, a third individual filed an insurance claim for the 2011 Porsche Panamera for an alleged collision that occurred on or about October 3, 2017. Individual 2 was the alleged driver of the Porsche, and **FOMBE** was the alleged driver of the other vehicle involved in the collision. **FOMBE** had in fact rented a car in North Carolina and conspired with Individual 2 to stage the collision in order to submit a fraudulent insurance claim because **FOMBE** was not satisfied with the Porsche following its purchase.

Second, a $50,000 check was drawn on the BB&T Swift Transfer Account, made payable to Business 2. This check was deposited on or about April 25, 2017, into TD Bank account x6714 held in the name of Business 2. A relative of **FOMBE**'s was the sole signatory on the account. On April 5, 2019, a magistrate judge in the District of Maryland issued a seizure warrant and investigators subsequently seized $49,703.07 from TD Bank account x6714.

Third, a $49,975.39 check made payable to Business 3, which was deposited on or about April 25, 2017 into SunTrust bank account x2983 held in the name of Business 3. Individual 3, the sole account signatory, opened this account on or about April 21, 2017. On or about May 3, 2017, these funds were used in turn to purchase a $45,000 cashier's check made payable to Business 4. On May 3, 2017, **FOMBE** used the debit card associated with the BB&T Swift Transfer Account to book a flight via a Southwest Airlines departing from Washington, D.C. (DCA) to Houston, Texas the next day. The $45,000 cashier's check was cashed on or about May 9, 2017, in Houston, Texas.

Victim M sent three additional fraudulently obtained wires: a $95,870 wire to Business 3; a $198,328.57 wire to Business 4; and a $193,163.95 wire to Business 4.

Star's Peoples Republik LLC / Victim A (BEC) and Victim L (Check)

On or about September 27, 2016, **FOMBE** and **Attia** registered and caused to be registered in Washington, D.C., the fraudulent, fictitious, and shell business "Star's Peoples Republik LLC." In order to register "Star's Peoples Republik LLC," **FOMBE** provided **Attia** with a fake drivers license that included **Attia**'s photograph and the name of another individual. On or about June 22, 2017, **Attia** opened in Maryland a SunTrust business checking account ending in x6296 in the name of "Star S Peoples Republik LLC; [redacted]; Sole Proprietor" (the "Star SunTrust Account").

9

On or about June 26, 2017, **Attia** sent **FOMBE** a WhatsApp message with the account information for the Star SunTrust Account.  The next day, **FOMBE** sent **Attia** a WhatsApp message requesting "the last 4 for the ein," and **Attia** responded with the numbers "8123."

On or about July 31, 2017, the Star SunTrust Account received a deposit of $12,580 via a wire from Victim L, a company in Bangkok, Thailand, intended for a beneficiary other than Star's Peoples Republik LLC.  On or about August 7, 2017, the Star SunTrust Account received a deposit of $250,000 via a wire from Victim A, a business located in California.  Also on or about August 7, 2017, **Attia** and **FOMBE** sent each other a series of WhatsApp messages, including the messages set forth in the table below:

| Sender | Message |
| --- | --- |
| **Attia** | They don block the account |
| **Attia** | I dey phone with them |
| **Attia** | I mean close the account |
| **FOMBE** | Wow |
| **Attia** | Yeah |
| **Attia** | They don put me on hold |
| **Attia** | Any how I di still bring those things |
| **Attia** | So we don't get to loose out |
| **FOMBE** | Cut the call |
| **FOMBE** | Enter bank move the balance for the account |

Best Alter Solutions Inc., Xena Ventures LLC, Fnu Swift LLC

On or about February 14, 2017, **FOMBE** incorporated Best Alter Solutions Inc.

On or about February 23, 2017, **FOMBE** opened a business checking account ending in x4156 at PNC Bank in the name of Best Alter Solutions Inc, with **FOMBE** as the sole signatory.  On April 17, 2017, Best Alter Solutions Inc. cashed a $12,000 cashier's check remitted from Swift Transfers LLC.

On or about May 19, 2017, **FOMBE** opened two bank accounts at Woodforest National Bank, a personal checking account ending in x2719 in the name of Fnu **FOMBE**, and a business checking account ending in x1183 in the name of Best Alter Solutions Inc, with **FOMBE** as sole signatory.  On September 8, 2017, there was a $200 debit from the Best Alter x1183 account to an alias of **FOMBE**'s (the same alias found on a fake license recovered from **FOMBE** by U.S. Park Police on or about August 22, 2018).

On or about August 21, 2017, **FOMBE** incorporated Xena Ventures LLC.  The Resident agent was "Valentine Fnu," with authorized person "Individual 5."

On or about August 22, 2017, Individual 5 opened a SunTrust business checking account ending in x0654 in the name of Xena Ventures.  On September 19, 2017, this account received two unauthorized incoming wires: a $287,000.00 wire from Victim O, a

10

resident of Florida, and a $3,662.70 wire from Victim P, a business located in Washington. On September 20, 2017, a $189,587.56 check was drawn on SunTrust x0654 to Best Alter's Woodforest x1183 account and was attempted to be deposited in the Best Alter's Woodforest x1183 account. This deposit was blocked by SunTrust and, on September 25, 2017, Xena Ventures SunTrust account x0654 was closed.

On or about October 31, 2017, **FOMBE** incorporated Fnu Swift LLC. Fnu **FOMBE** was the owner and resident agent.

On or about November 1, 2017, **FOMBE** opened another bank account at Woodforest ending in x1464, in the name of Fnu Swift LLC, Fnu Njuh Valentine **FOMBE**. On March 5, 2018, the Woodforest x1464 account received a $7,000 online transfer. On March 19, 2018, $4,580.26 was seized by the U.S. Marshals Service.

On or about February 13, 2018, Individual 6 opened a Bank of America business checking account in Massachusetts ending in x4928 ("BOA x4928"). On or about March 2, 2018, BOA x4298 received an incoming fraudulent wire in the amount of $386,100 from Victim Q, a resident of New York. In addition to other transactions, on or about March 5, 2018, there was a $160,357.60 wire transfer from BOA x4298 to Best Alter's Woodforest x1183 account. The following transactions subsequently took place, among others:

| Date | Transactions in Best Alter – Woodforest x1183 |
|---|---|
| 3/5/2018 | $160,357.60 incoming wire transfer from BOA x4298 |
| | $800.00 ATM cash withdrawal at Russett Green East, Laurel, MD |
| | $6,000.00 online transfer to Woodforest x2719 (**FOMBE** account) |
| | $7,000.00 online transfer to Woodforest x1464 (Fnu Swift account) |
| | $30,000.00 OTC cash withdrawal by Fnu Njuh Valentine **FOMBE** with signature |
| | $5,250.00 Certificate of Deposit purchase |
| | $20.00 debit wire transfer fee |
| 3/7/2018 | $44.68 debit Sunoco Ridgefield, New Jersey |
| 3/8/2018 | $25.00 debit EZPass MD |
| 3/19/2018 | $111,409.78 debit pursuant to federal seizure warrant |

On March 19, 2018, Woodforest closed Best Alter's x1183 account, the Fnu Swift x1464 account, and the **FOMBE** x2719 account. Debits from all three accounts reflect that **FOMBE** travelled to Massachusetts shortly after the $386,100 wire was received into the BOA x4298 account. In addition, on March 16, 2018, the United States District Court for the Eastern District of New York issued a seizure warrant for $162,357.60 in the Best Alter x1183 account (18-M-0230-SMG).

Mbi Fuo B **Attia** / Victim B

On or about May 22, 2017, **Attia** opened in Maryland a SunTrust checking account ending x3437 in the name of Mbi Fuo B **Attia** (the "**Attia** SunTrust Account").

11

On or about July 6, 2017, **FOMBE** sent a message to **Attia**, stating: "Send me the account number and account name make I do some deposit." **Attia** thereafter sent an image of the **Attia** SunTrust account signature card, the front and back of the associated debit card, and the name, bank, account number, routing number, and address on the account.

On or about October 8, 2017, **FOMBE** deposited a $16,019.04 check purportedly drawn on a ScottTrade account. That same day, **Attia** sent to **FOMBE** an image of the check and, on October 11, 2017, **Attia** sent **FOMBE** a screenshot of a phone stating "this payment failed."

On or about November 6, 2017, **Owolabi** sent **Attia** a WhatsApp message that requested **Attia** to "send me the sunny again pls." **Attia** responded with the banking information for the **Attia** SunTrust Account.

On or about November 6, 2017, **Owolabi** sent **Attia** a WhatsApp message stating, "good news awaits us this week."

On or about November 8, 2017, the **Attia** SunTrust Account received a $50,000 wire from Victim B, a resident of Tennessee. The notes on the wire stated that the intended beneficiary was a church and that the wire was for Victim B's "2018 Capital Pledge."

Later on or about November 8, 2017, **Owolabi** sent **Attia** a WhatsApp message containing an image of the transaction number for the $50,000 wire from Victim B to the **Attia** SunTrust Account. The following transactions, among others, then occurred:

| November 9, 2017 | $5,000 transfer to SunTrust account x1936 (held in name Mbi Fuo B **Attia**) |
| November 9, 2017 | $28,500 withdrawal: (1) $20,000 cashier's check in the name Mbi Fuo B **Attia**; and (2) $8,500 cash |
| November 9, 2017 | $20,000 cashier's check to Identity Theft Victim M.J., an alias of **FOMBE**. This check was deposited that same day into Bank of America account x5254, in the name of Identity Theft Victim M.J. |

JBS Holding LLC / Victims C and D (BEC), and Victims H and I (Check)

On or about November 16, 2017, **Attia** and **FOMBE** sent each other WhatsApp messages, including the WhatsApp messages set forth in the table below:

| Attia | Abeg u get any name is fit use make new PP |
| FOMBE | I get for buy bitcoin do it |
| FOMBE | Will take care of that shortly |
| Attia | Ok Bro cos they deny to open me sunny |
| Attia | So dude [**Owolabi**] want make me new po |
| Attia | Pp |

| FOMBE | K |
|---|---|

On or about November 29, 2017, **Attia** registered and caused to be registered in Maryland the fraudulent, fictitious, and shell business "JBS Holding LLC" and listed the Minnesota Identity Theft Victim as the company's authorized person and registered agent.

On or about December 6, 2017, **FOMBE** sent **Attia** a WhatsApp message with an Equifax cover sheet reflecting the name of the Minnesota Identity Theft Victim and **Attia** responded, "Yessssss." **FOMBE** and **Attia** also discuss getting an Employee Identification Number.

On or about December 7, 2017, **Attia** opened a SunTrust business account ending in x4720 in the name "JBS Holding LLC" (the "JBS Holding SunTrust Account"). The Minnesota Identity Theft Victim was the sole signatory on the JBS Holding SunTrust Account.

On or about December 11, 2017, **Attia** opened a Woodforest business account ending in x1077 in the name "JBS Holding LLC" (the "JBS Holding Woodforest Account"). The Minnesota Identity Theft Victim was the sole signatory on the JBS Holding Woodforest Account.

On or about December 10 and 11, 2017, **Attia** sent **FOMBE** the bank account information for three bank accounts opened in the name of JBS Holding, including the JBS Holding SunTrust Account and the JBS Holding Woodforest Account.

On or about December 19, 2017, the JBS Holding Woodforest Account received a $49,671.90 wire from Victim C, a business located in Michigan.

Also on or about December 19, 2017, **Owolabi** sent **Attia** a WhatsApp message containing an image of an invoice to Victim C totaling $49,671.90, and a second message containing an image of wiring instructions to Victim C that directed the wire to be sent to the JBS Holding Woodforest Account.

On or about December 27, 2017, **Attia** deposited into the JBS Holding Woodforest Account at a Woodforest branch in Maryland a $145,650.45 check drawn on the HELOC account of Victims H and I, a married couple residing in Florida.

Also on December 27, 2017, **Attia** sent **Owolabi** a WhatsApp message containing an image of a letter from Woodforest notifying the holder of the JBS holding Woodforest Account of a delay in the availability of account funds.

On or about January 2, 2018, **Attia** sent **Owolabi** a WhatsApp message containing the banking information for the JBS Holding SunTrust Account.

On or about February 22, 2018, **Owolabi** sent **Attia** WhatsApp messages, including the messages set forth in the table below:

| Sender | Message |
|--------|---------|
| **Owolabi** | Morning |
| **Owolabi** | Pending |
| **Owolabi** | JBS |

Also on or about February 22, 2018, **Owolabi** sent **Attia** a WhatsApp message containing an image of an invoice for $86,116.51 with instructions directing the recipient to remit payment to the JBS Holding SunTrust Account.

On or about February 22, 2018, the JBS Holding SunTrust Account received an $86,116.51 ACH payment from Victim D, a business located in Hawaii.

On or about February 27, 2018, the JBS Holding SunTrust Account received a second ACH payment totaling $86,462.92 from Victim D.

PSP Holdings / Victim G

On or about May 30, 2018, **FOMBE** opened and caused to be opened in Maryland a SunTrust business bank account ending in x7269, in the name of PSP Holdings, the sole signatory of which was reported to be the Deceased Identity Theft Victim (the "PSP Holdings SunTrust Account").

On or about July 16, 2018, the PSP Holdings SunTrust Account received a deposit of $65,000 via a wire from Victim G.

**The Money Laundering Conspiracy**

Beginning at least in or about May 2017, and continuing until at least in or about August 2018, in the District of Maryland and elsewhere, **FOMBE**, **Attia**, and **Owolabi** did knowingly and willfully conspire with each other and others to conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity—to wit, wire fraud, in violation of 18 U.S.C. § 1343—while knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity and (a) with the intent to promote the carrying on of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i); and (b) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

The money laundering conspiracy involved sophisticated laundering in that **FOMBE** and his co-conspirators used stolen identities; created fictitious entities; used shell companies; and layered the monetary transactions into multiple levels in order to make them appear legitimate and to successfully launder the fraud proceeds.

It was part of the conspiracy that **FOMBE**, **Attia**, **Owolabi**, and their co-conspirators opened and managed, or caused to be opened and managed, Drop Accounts

held in their own names, in aliases, and in the names of the fraudulent, fictitious, and shell businesses that they had registered, in order to direct into and receive the proceeds of BEC schemes and Check schemes. **FOMBE**, **Attia**, **Owolabi**, and their co-conspirators then disbursed the money received from the Victims into Drop Accounts by using wires to transfer money to other Drop Accounts, by withdrawing sums of money in cash, by obtaining cashier's checks, and by writing checks to other individuals or entities, all to promote wire fraud conspiracy and other criminal conduct, and to hide true ownership and disguise the nature, source, and control of those assets.

In furtherance of the conspiracy, and to effect the objects thereof, **FOMBE**, **Attia, Owolabi**, and others committed and caused to be committed the following acts, among others, in the District of Maryland and elsewhere:

The Pennsylvania Identity Theft Victim / Victim G

On or about June 13, 2018, **Attia** opened a Wells Fargo checking account (account number ending in x5244) in the name of Individual 1 (the "Pennsylvania Victim's Wells Fargo Account").

On or about July 17, 2018, **FOMBE** purchased and caused to be purchased from the proceeds of the BEC scheme on Victim G a $19,500 cashier's check made payable to the Pennsylvania Identity Theft Victim, which prior to the purchase was held in the PSP Holdings SunTrust Account. That same day, **Attia** deposited and caused to be deposited the cashier's check into the Pennsylvania Victim's Wells Fargo Account.

**Search Warrant and Subsequent Flight from the United States**

On September 25, 2019, law enforcement executed a search warrant at **FOMBE**'s residence located in Beltsville, Maryland. During the execution of the search warrant, law enforcement seized, among other items, $5,250 in U.S. currency, which were proceeds of the conspiracy and scheme to defraud. **FOMBE** was not present during the search. Individual 4, who was present during the search, was informed by law enforcement that a federal arrest warrant had been issued for **FOMBE**.

Shortly thereafter, law enforcement determined that **FOMBE** had fled the United States to Mexico. On February 5, 2020, law enforcement had a conversation with Individual 4, during which law enforcement reiterated to Individual 4 that **FOMBE** was under indictment and considered a fugitive. Individual 4 stated that, after the search warrant was executed at Individual 4's and **FOMBE**'s residence, Individual 4 and **FOMBE** met with an attorney and **FOMBE** then left and did not tell her his location, though she later received a phone call from **FOMBE** during which **FOMBE** said that he was in Canada.

On or about May 17, 2022, law enforcement began receiving notice that Individual 4 was scheduled to enter the United States from the United Kingdom at the Baltimore/Washington International Thurgood Marshall Airport. On May 21, 2022, after

Individual 4 presented herself for admission to the United States, law enforcement seized, pursuant to its border search authority, Individual 4's cellular telephone.

On Individual 4's cellular telephone, law enforcement located a WhatsApp chat with an individual identified as "Vally Kmer," determined to be **FOMBE**. Within the chat, law enforcement observed a Honduran passport in the name of "Rosnell Eduardo Martinez Garcia," but with a picture of **FOMBE**. The Honduras government confirmed that the passport was a legitimate passport obtained by **FOMBE** using false identifiers, commonly referred to as a fraudulently-obtained genuine passport. The passport had been used to enter and exit the United Kingdom on multiple occasions in 2020 and 2021, and **FOMBE** entered the United Kingdom using this passport as recently as March 28, 2022, flying from Cameroon through Brussels and entering the United Kingdom through Birmingham International Airport. Prior to March 28, 2022, **FOMBE**, using the Honduran passport, traveled to the United Kingdom from Cameroon on December 17, 2021, departing back to Cameroon on March 18, 2022, where he remained for approximately 10 days before returning to the United Kingdom on March 28, 2022.

Upon identifying **FOMBE**'s location, **FOMBE** was arrested on a provisional arrest warrant in the United Kingdom on June 16, 2022, and thereafter consented to extradition to the United States.

<u>No Agreement</u>

11. Given that the parties have not entered into any plea agreement, there are no agreements, promises, undertakings, or understandings between the Defendant and the Government with respect to the Guidelines calculation, the Defendant's criminal history, the sentence to be recommended, or any other issues related to sentencing.

Very truly yours,

Erek L. Barron
United States Attorney

Kelly O. Hayes
Christopher M. Sarma
Assistant United States Attorneys